IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Earl A. Cates et al.,                                          Case No. 3:06CV0940

        Plaintiffs,

    v.                                                            ORDER

 Cooper Tire and Rubber Company,

        Defendant.

      This is a dispute over post-retirement health benefits. Plaintiffs Earl Cates, Bobbie Grammar

and Rita Kervin allege that Cooper Tire and Rubber Co. [Cooper] – an Ohio-based tire manufacturer

and retailer, breached a pension and insurance agreement [Agreement] allegedly requiring it to pay

their medical benefits' costs for life and, thereby, also breached a fiduciary duty it owed them. Cates,

a former employee of Cooper, and Grammar and Kervin, spouses of former Cooper employees,

allege violations of §§ 502(a)(1)(b) and 502(a)(3) of the Employee Retirement Income Security Act

of 1984, 29 U.S.C. § 1001, et seq. [ERISA], respectively. Plaintiffs also seek relief on the basis of

equitable estoppel. Jurisdiction exists under 28 U.S.C. § 1331 and 29 U.S.C. § 1132.

Pending is plaintiffs' motion on the pleadings with regard to their claim that Cooper breached the Agreement. [Doc. 40]. For the reasons discussed below, plaintiffs' motion shall be granted.

## Background

Cooper has tire manufacturing plants in Texarkana, Arkansas and Findlay, Ohio, among other places.

In 1983, Cooper negotiated the first in a series of Agreements guaranteeing its employees and retirees certain benefits. Though Cooper and the local labor union negotiated each agreement individually, the Agreements' terms were similar. Likewise, while the parties have renegotiated the Agreement at each of Cooper's locations multiple times, excluding certain exceptions discussed below, they have not significantly altered the terms.

Among other benefits, the Agreement guarantees all employees certain health benefits. Article 11.1 provides:

> As of the Effective Date and for the duration of the Agreement, the Company will provide the following plan of hospital expense benefits, hospital medical benefits, surgical benefits, prescription drug benefits, dental benefits, vision care and major medical benefits, with the exception that none of the aforementioned benefits (of which all are medically necessary) shall be applicable in the event of accident or ailness covered by the Workers Compensation Act. Charges which are determined by the Company's physician-reviewers, or by provision of Title XVIII of Medicare, or on the basis of other scientific input to not be medically necessary or not accepted as medically appropriate for the treatment of any non-occupational illness or injury will not be covered expenses. These benefits are subject to the provisions of the Memorandum of Agreements concerning health care dated January 7, 1987.[1]

[Doc. 1, Ex. 1].

---

[1] As the Agreements are comparable, I will not provide each Agreement's language. For the purposes of this opinion, I will use the Texarkana Agreement effective March 17, 1999.

2

Article 11.2, entitled "Deductions and Co-Payment Amounts" lists payments beneficiaries must pay:

> (a) the deductible under the basic medical plan will be two hundred dollars ($200) per employee, including dependents, each benefit year; (b) the co-payments for all eligible charges under the basic medical plan will be twenty percent (20%); (c) the co-payment maximum per benefit year will be eight hundred dollars ($800) exclusive of the charges used to satisfy the deductible in (a) above. Once the eight hundred dollars ($800) limit is reached in a benefit year, the basic medical plan will pay one hundred percent (100%) of those eligible expenses incurred during the remainder of the same benefit year.[2]

[*Id.*].

Section 11.15 extends these benefits to certain retirees, their spouses and their dependants:

> Employees who retire and who are eligible under the Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in the Article . . . The surviving spouse of an employee who is retired by the Company on or after the effective date of the Agreement . . . shall continue to be eligible to receive such benefits to the earlier date of death or remarriage provided such spouse, as of the date of death of such retired former employee, was covered for these benefits as an eligible dependent at the time of the Employee's retirement or had been legally married to the Employee for at least twelve (12) consecutive months preceding his death . . . . Employees hired after March 6, 1993 and who retire after completion of at least twenty (20) years of continuous service and who are eligible and receiving a monthly pension shall receive the

---

[2] The Agreements changed in one significant regard. Cooper gradually increased the deductible and co-payments it required. As per its Texarkana employees, in 1989, the Agreement provided that the deductible under the basic medial plan would be $200. The Agreement did not require a co-pay. In 1999, the Agreement required a deductible of $200 plus a co-pay of twenty percent for all eligible charges not exceeding $800 dollars per year. In 2002, Cooper increased the deductible to $300 with a twenty percent co-pay for in-network services and a thirty percent co-pay for out of network services, not exceeding $1500 dollars per year. These changes applied to employees, employees who retired during the term of the relevant Agreement and already-retired employees. Cooper listed these changes in a memorandum it distributed annually to employees. Cooper also increased the deductible and co-payments for Findlay employees and the cost of prescription drug benefits for employees at both plants.

benefits described in this article.

[*Id.*].

Article 4.1 addresses retirees' pension benefits:

An employee retiring during the life of the Agreement who shall have attained the age of sixty-five (65) and who either has not less than five (5) years of Credited Service at his Normal Retirement Date or shall have been hired before his attainment of age sixty (60) shall be entitled to receive a pension upon retirement and upon the filing of an application for benefits as hereinafter provided  .  .  .  An employee who shall have attained Normal Retirement Age shall have a non-forfeitable interest in the Pension.

[*Id.*].

Article 9.1 provides "Survivor Income Benefits":

During the life of this Agreement, the Company will provide for active Employees[,] beginning on the day following completion of thirty (30) days of Continuous Service Credit[,] the Survivor Income Benefits described in this article.

[*Id.*].

Article 9.2 limits these benefits' duration:

If an Employee dies on or after the Effective Date, while covered for Transition Survivor Income Benefits, leaving one or more survivors  .  .  .  payment of not more than twenty-four (24) monthly Benefits shall begin  .  .  .

[*Id.*].

Article 13.1 discusses "Supplemental Workers' Compensation Benefits":

With respect to an absence, caused by occupational injury or illness, the following plan of Supplemental Workers' Compensation Benefits will continue in effect for the duration of the Agreement for all employees in the Bargaining Unit.

[*Id.*].

Article 13.4 discusses these benefits' duration:

Benefits will be paid for the duration of the disability[,] but not to exceed fifty-two (52) weeks for each period of disability. Periods of disability due to the same cause

4

will be considered the same period of disability.

[*Id.*].

Section 15.4 limits the Agreement's duration:

The Agreement shall continue in effect until and including the 4th day of March, 2000. Thereafter, it shall renew itself for yearly periods unless written notice is given by either party to the other not less than sixty (60) days, but not more than seventy-five (75) days, prior to the expiration date or an extension thereof, that it desire[s] to terminate or amend this Agreement . . . . If negotiations are not completed prior to the expiration date, this Agreement together with the Basic Labor Agreement, shall terminate unless extended by mutual agreement of the Parties. Upon termination[,] this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination. Except as herein otherwise provided, no provision of this Agreement shall be subject to change prior to the expiration date of this Agreement.

[*Id.*].

Along with copies of the Agreement, Cooper annually distributed to its employees an Employment Benefit Summary [Summary] summarizing the then-valid Agreement's contents. Each copy included a general disclaimer on its first page stating that Cooper guaranteed the described benefits only for the period stated. For example, the 1999 Summary Cooper distributed to its Texarkana employees explicitly stated that benefits described were for the period beginning on March 17, 1999 and concluding on March 4, 2002.

Cooper, in 1991, contemporaneously began negotiating a series of supplementary agreements, referred to by the parties as letters [Letters], with local unions regarding caps on the medical benefits the Agreements required Cooper to provide.

In December, 1990, the Financial Accounting Standards Board issued Financial Accounting Standards Statement No. 106 [FAS 106] requiring that companies recognize the projected future cost of providing post-retirement benefits as an expense at the time employees performed services, rather

5

than when the company paid them. In order to limit their expenses, Cooper proposed to the union caps on benefits it provided to its employees.

Excluding the 1992 Texarkana letter, Cooper and an individual union representing Cooper's employees agreed to each Letter.

The Letters' terms were similar. Each Letter set a cap on the dollar amount Cooper would pay annually towards the medical expenses of employees who retired on or after a certain date or dates. If the annual company contributions, calculated on a per retiree basis, exceeded the cap, then Cooper would allocate the excess cost evenly among all retirees and surviving spouses.[3]

Finally, each Letter included an implementation date after which Cooper would impose the caps.

Cooper did not distribute the Letters to employees, nor did it disclose their contents in the annual Summary. Cooper, however, alleges that it notified its employees of the caps in a 1995

---

[3]

The Letters explained how Cooper would calculate the retirees' contributions:

> 1. The average annual Company contributions to be paid for all health care benefits per retired employee (including their surviving spouses) who retired on or after November 16, 1992, shall not exceed $9,800 for retirees (including surviving spouses) under age 65 and $3,850 for retirees (including surviving spouses) over age 65 . . .
> 2. If the average annual cost of health care benefits for each such group described in paragraph 1 above exceeds the amount, the cost in excess of that amount shall be allocated evenly to all retired employees (including surviving spouses) in such group.
> 4. The average annual cost of health care benefits for each such group shall be determined by taking the annual health care payments made by the Company for each group separately and dividing each amount by the number of employees (including surviving spouses) in such group as of January 1 of each year.

[Doc. 23, Ex. 3].

6

memorandum employee representatives should have distributed.

In December, 2003, Cooper sent a letter to all affected hourly retirees and surviving spouses explaining the caps' effect on medical benefits. Cooper sent a follow-up letter on December 19, 2003, announcing the required contributions for retirees and surviving spouses for 2004. In January, 2004, Cooper implemented the caps.

Plaintiffs subsequently filed this suit seeking to enjoin Cooper from imposing a cap on or requiring additional costs for retiree medical benefits. The plaintiffs also seek attorneys' fees, costs, and additional unspecified damages.

### Standard of Review

Fed. R. Civ. P. Rule 12(c) provides that a party may move for judgment on the pleadings after the pleadings are closed, but within such time as not to delay trial. When ruling on a motion for judgment on the pleadings, the court may look only to the facts in the pleadings.[4] *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997). The court will take all well-pleaded material allegations of the non-moving party's pleadings as true, and all allegations of the moving party which the opposing party denies as false. *Pension Benefit Guaranty Corp. v. Bank One*, N.A., 34 F. Supp. 2d 608, 609 (S.D. Ohio 1998). The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10,12 (6th Cir. 1987). The court may grant judgment on the pleadings only if, on the facts as to admitted allegations, the law clearly

---

[4]

I may consider documents the parties presented when ruling on a motion for judgment on the pleadings. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.") (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

entitles the moving party to judgment. *Id.*

## Discussion

Section 502(a)(1)(b) of ERISA, 29 U.S.C. § 1132(a)(1)(b), gives jurisdiction to federal courts over claims alleging breach of an employee benefits agreement. *See Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991). A retiree health benefit plan is a welfare benefit plan under ERISA. *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993).

ERISA does not subject welfare benefit plans to mandatory vesting requirements. *Id.* at 1004-05. "Therefore, there is no statutory right to vested retiree benefits, and the parties must agree to vest a welfare benefit plan." *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). If the parties intended that the benefits vest and the employer subsequently limits them, it has committed an ERISA violation. *See Armistead*, *supra,* 944 F.2d at 1293.

In its central decision on the interpretation of employee benefits agreements, *Int'l Union v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983), the Sixth Circuit stated:

> Whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties . . . The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement. The enforcement and interpretation of collective bargaining agreements under § 301 [of the LMRA] is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies . . . [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.
>
> Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other

8

durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy[,] but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

Courts can find that rights have vested even if the parties have not explicitly set out the intent to vest in the agreement. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 655 (6th Cir. 1996). In making this determination, a court may also consider the parties' practice, usage and custom. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989).

The Sixth Circuit has further recognized that the context in which such agreements are negotiated merits that courts draw an additional inference that the parties intended benefits to vest.

This inference has two bases. First, retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Int'l Union v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999) (quoting *Yard-Man*, *supra,* 716 F.2d at 1482).

Second, because "benefits for retirees are only permissive not mandatory subjects of collective bargaining . . . it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Yard-Man*, *supra,* 716 F.2d at 1482 (citations omitted).

Expounding on the second basis, the Sixth Circuit, in *Yolton*, *supra,* 435 F.3d at 581 n. 6, noted that "perhaps . . . the *Yard-Man* inference makes the most sense" where retirees who retired under a previous benefit plan are challenging changes the employer made to the plan after they retired. "Retirees, who have left their bargaining unit, and can no longer rely on their union to

9

maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer." *Id.*

Although there is an inference that parties to a benefits agreement intended for retiree benefits to vest, the burden of proof does not shift to the employer, and the law does not require that the parties have used specific anti-vesting language before a court can find that the parties did not intend benefits to vest. *BVR Liquidating*, *supra,* 190 F.3d at 772.[5]

---

[5]

Cooper disputes that *Yard-Man* applies to this case.

First, Cooper argues that the Sixth Circuit's decisions in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) and *Sengpiel v. B.F. Goodrich Co.*, 156 F.3d 660 (6th Cir. 1998), should govern this case. In *Sprague*, *supra,* 133 F.3d at 400, and *Sengpiel*, *supra,* 156 F.3d at 667, the Sixth Circuit held that for an Agreement to vest employee benefits for life, the Agreement must explicitly state such. The Sixth Circuit, however, has since distinguished *Sprague* and *Sengpiel* from the *Yard-Man* line of cases. The Sixth Circuit, in *BVR Liquidating, Inc.*, *supra,* 190 F.3d at 773, explained that *Sprague* only applied to cases in which the employer unilaterally imposed the Agreement and included a clause in the Agreement allowing it to amend or terminate the program. As Cooper admits in its brief, the parties negotiated the Agreement and it does not include a reservation of rights clause.

Second, Cooper argues that *Yard-Man* is inappropriate here because, rather than terminating benefits, the Letters merely imposed a cap on the amount of benefits Cooper would provide. The Sixth Circuit has affirmed that *Yard-Man* is not only appropriate where the employer terminates benefits, but also where an employer places additional limitations on previously vested benefits. *See Int'l Union v. Loral*, 1997 WL 49077, *1 (6th Cir. 1997) (unpublished disposition) ("This argument cannot be reconciled with our prior case law, which has applied *Yard-Man* in situations where the benefits scheme has been modified by the employer, but not eliminated entirely.").

Third, Cooper argues that *Yard-Man* does not apply because, unlike other cases in which the employer imposed limitations after the employee retired, Cooper negotiated the caps before plaintiffs retired. Cooper correctly points out that the *Yard-Man* inference recognizes that courts should draw an inference in favor of an agreement that the parties reached while the employee retained a place at the bargaining table. Accordingly, Cooper argues that *Yard-Man* is distinguishable from the present case in which the retirees retired after their Union had negotiated caps on their benefits. This, at most, suggests that the *Yard-Man* inference is inapplicable to this situation. It does not affect whether the *Yard-Man* framework applies to this factual scenario. I must

10

## 1. Was the Vesting Clause Unambiguous
## With Regards to the Parties' Intent?

In determining whether benefits vested, I must first examine the granting clause's explicit language. Considering that the clause is silent as to duration, I conclude that the clause is ambiguous. My decision is consistent with the Sixth Circuit's ERISA decisions which have consistently found almost identical clauses ambiguous. *See Yard-Man*, *supra,* 716 F.2d at 1480 (finding the clause "[t]he Company will provide insurance benefits equal to active group benefits . . . for the former employee and his spouse" to be ambiguous); *Loral*, *supra,* 1997 WL 49077, *2-3 (finding the clause "[e]mployees who retire and who are eligible shall receive the benefits

---

still look to the intent of the parties in determining whether benefits vested. Likewise, I must examine the Agreement's four corners before considering extrinsic evidence. These interpretive rules do not depend on the characterization of benefits, but are basic principles of contractual interpretation. *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 514 F.3d 621, 634 (6th Cir. 2008) ("If a contract is clear and unambiguous . . . a court should not use extrinsic evidence to attempt to discern the intent of the parties, but rather should determine their intent from the plain language of the contract.").

Nor am I convinced that the *Yard-Man* inference is inapplicable here. That the specific plaintiffs in this case may have retired after the parties agreed to the Letter does not change that health benefits are merely permissive subjects of negotiation. Accordingly, Cooper's employees when negotiating over them maintained an incentive to have them vest for life, for fear that they may not have another opportunity to negotiate over them. Regardless, if I accepted Cooper's argument, as explained above, the *Yard-Man* inference has a dual basis, only one of which Cooper challenges. Retirement benefits, regardless of when the plaintiffs retired, remain status benefits and therefore, by their nature, their distribution is premised on the assumption that the employer will continue to provide benefits as long as the beneficiary retains his status as a retiree. *See Pringle v. Continental Tire North America, Inc.*, 2007 WL 2236880, *4 (N.D. Ohio 2007) ("the very fact that the benefits at issue belong to retirees creates an inference (but not a presumption) that such benefits are 'intended . . . to continue as long as the beneficiary remains a retiree.'") (quoting *Yard-Man*, *supra,* 716 F.2d at 1482). Recognizing such, at least one court has applied the *Yard-Man* inference to plaintiffs whose case satisfied only one of the bases underlying the inference. *Id.* at *4 (applying the *Yard-Man* inference even where an agreement mandated that the parties subsequently bargain over retirement benefits).

11

described" to be ambiguous).

## 2. Do the Agreement's Other Provisions
## Demonstrate the Parties' Intent?

Because the clause concerning retirement benefits is ambiguous, I must examine the Agreement's other provisions. Before I proceed, however, I shall address Cooper's argument that I must consider the Letters before deciding whether the parties intended that benefits vest.

### A. Must I Consider the FAS Letters
### Before Making A Decision?

Cooper, while explicitly admitting multiple times throughout its briefs that the letters were separate agreements and, thus, extrinsic evidence, posits that I must, regardless of the Agreement's clarity, consider them before I reach my decision.[6] This argument misinterprets *Yard-Man* and basic principals of contract interpretation. Under *Yard-Man*, *supra,* 716 F.2d at 1479, if the court finds the clauses concerning retirement benefits ambiguous, it will then consider the Agreement's four corners. Only if it finds the Agreement facially ambiguous, will it then consider other extrinsic evidence indicative of the parties' intent – even if it is, as plaintiffs argue, inextricably intertwined

---

[6]

On page twenty of its brief in opposition to plaintiffs' sur-reply, Cooper states that the "court must consider the letters because they are dispositive extrinsic evidence." [Doc. 55]. On page thirty of its opposition brief, Cooper notes that while in other cases, "no extrinsic evidence [existed] .   .   . [h]ere such evidence exists in the form of FASB letters." [Doc. 44]. On page twelve of its response to plaintiffs' surreply, Cooper admits that the letters were "separate and distinct agreements." [*Id.*]. On page ten of its opposition brief, Cooper notes that the Agreement does not reserve the authority to "modify, alter, or terminate the health care benefits set forth in the Agreement." [*Id.*]; *see Pringle, supra*, 2007 WL 2236880, *5-6 (treating FAS letters as part of the Agreement for *Yard-Man* purposes where defendant stipulated that the letters were amendments to the plan).

Cooper at no point argues that the letters were part of the Agreement or amendments to the Agreement. Had Cooper argued such and supplemented this assertion with sufficient factual allegations, considering the low standard which it has to meet, I might have analyzed the letters as part of the Agreement for this motion's purposes.

with the Agreement.[7] *Id.*; *see Yolton*, *supra,* 435 F.3d at 579 ("Where the above analysis fails to resolve any ambiguities, courts may look to extrinsic evidence to determine the parties' intent.").

## B. The Parties' Intent

While precedent does not limit my analysis to them, the Sixth Circuit has generally considered five factors when examining an Agreement's text as to whether the parties intended retirement benefits to vest: 1) whether the Agreement ties retirement benefits to pension benefits, *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996); 2) whether the Agreement includes general or specific durational clauses, *Yolton*, *supra,* 435 F.3d at 580-81; 3) if the latter, which sections did and did not contain specific durational clauses, *Yard-Man*, *supra,* 716 F.2d at 1480; 4) whether finding that benefits did not vest would render other provisions illusory, *Id.* at 1481-82; and 5) whether the Agreement includes a reservation of rights clause, *Yolton*, *supra,* 435 F.3d at 582 (analyzing the employer's argument that benefits did not vest because the Agreement contained a reservation of rights clause). As noted below, each of these factors when applied to the Agreement, evidence the parties' intent that benefits vest.

### i. Tying Retirement Benefits to Pension Benefits

First, I note that article 11.15, governing retiree health benefits, explicitly ties such benefits to eligibility for a pension. As the Sixth Circuit explained in *Golden*, *supra,* 73 F.3d at 656, "[s]ince retirees are eligible to receive pension benefits for life[,] .  .  .  tying retiree health benefits to

---

[7]

In finding that the letters were "inextricably intertwined" with the Agreement, my colleague Judge David Dowd did not find that the letters were part of the Agreement, but rather, as Cooper notes, "the letters fell within the scope of the Agreement's arbitration clause." [Doc. 59]; *United Steelworkers of America v. Cooper Tire & Rubber Co.*, 2005 WL 2649900, *6 (N.D. Ohio 2007).

pension eligibility indicates that the parties intended that the company provide lifetime health benefits as well."

The relevant provision here provides: "[e]mployees who  .  .  .  are eligible under the Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described  .  .  . ." This language closely resembles that which other courts have found ties benefits. *See Noe v. PolyOne Corp.*, 2008 WL 723769, *8 (6th Cir. 2008) (unpublished disposition) ("The Company shall contribute the full premium or subscription charge for Health Care .  .  . for (i) a retired employee (including any eligible dependents) provided such retired employee is eligible for benefits under Article II of the Company's Hourly-Rate Employees Pension Plan.").

### ii. General or Specific Durational Clauses

The Sixth Circuit has held that a durational clause in an Agreement separate from any language or reference to a specific type of benefits is a general clause, applicable only to the Agreement's duration and not the benefits' life. *See Maurer*, *supra,* 212 F.3d at 917-18 ("Even though the clause makes clear that the insurance agreement terminates after three years, caselaw indicates that the termination of the agreement does not indicate the termination of benefits it created, if the parties intended benefits to vest.").

As no language in article 15.4 references retirement benefits specifically, I conclude that it is a general durational clause and, therefore, not indicative of intent that benefits not vest.

### iii. The Presence of Specific Durational Clauses
### in Other Articles of the Agreement

In addition, the presence of specific durational clauses in articles concerning the provision of other benefits, but not in the article on retiree health benefits, suggests that the parties did intend that the latter vest. The inclusion of specific durational language "in other provisions of the current

14

collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements." *Yard-Man*, *supra,* 716 F.2d at 1481-82; *see also Yolton*, *supra,* 435 F.3d at 582 (discussing, with approval, the district court's citation of specific durational provisions in other sections of the CBA as evidence that retiree benefits vested under *Yard-Man*).

The articles on survivor income benefits and supplementary workers' compensation benefits provide that employees or their dependants shall receive benefits for twenty-four months and fifty-two weeks, respectively. Meanwhile, the article on medical benefits does not include a separate durational clause specifically addressing the duration of medical benefits.

Cooper argues in response that the article on medical benefits contains a specific durational clause. Cooper relies on article 11.1's opening line which provides that, for "the life and duration of this Agreement," Cooper shall provide the following medical benefits. Cooper argues that article 11.15, guaranteeing retirees the benefits article eleven describes, incorporates article 11.1's limitation. Cooper, in support, notes that article 11.1 states that it will not provide coverage for costs Title XVIII of ERISA, which is applicable only to retirees, deems unnecessary.

In *Yard-Man*, the Sixth Circuit rejected a similar argument. The applicable provision there stated that the employer would provide retirees benefits "equal" to those it provided active employees. *Yard-Man*, *supra,* 716 F.2d at 1480. The article addressing insurance benefits generally provided that Yard-Man would terminate benefits one month after "layoff" and immediately after a plant's closure. *Id.* Yard-Man argued that under the granting clause's terms it had to provide benefits equal in every capacity, including duration. *Id.* The Sixth Circuit found that the durational clause was not a specific durational clause for the purposes of retirement benefits. *See id.* at 1480-82

15

(finding the granting clause ambiguous as to duration and later comparing the article on retirement benefits with other articles in which the parties included specific durational clauses).

More generally, if I accepted Cooper's argument, I would relax the Sixth Circuit's preference for specific durational clauses. As explained in *Yolton*, *supra,* 435 F.3d at 581, "[a]bsent specific durational language referring to retiree benefits themselves," a durational clause "says nothing about those retiree benefits." In *Yolton*, where the issue was whether a life insurance plan for retirees vested for life, the court concluded that a provision stating that the "group insurance plan will . . . run concurrently with this Agreement" was a general durational clause and did not preclude a finding that retiree health benefits had vested. *Id.* Similar to the agreement in *Yolton*, article 11.1 does not include any language specifically stating that retiree health benefits expire on the termination of the agreement. It speaks generically of all medical benefits for all employees; language that does not constitute a specific durational clause in the Sixth Circuit. *See id.*; *see also Maurer*, 212 F.3d at 917-18 (finding that a CBA termination clause was not a specific durational clause because it did not specifically reference retiree benefits).

Finally, that the articles containing individual durational clauses also include language, preceding the grant of benefits, similar to that which Cooper relies on, further limits the effect of such language. That the parties felt it necessary to include in those sections separate specific durational clauses outlining the benefit's length, but did not include a separate clause in the section concerning medical benefits further suggests that the parties did not intend the words Cooper relies on to limit retiree benefits.

### iv. The Effect of an Interpretation on
### Other Clauses in the Agreement

16

If I accepted Cooper's arguments, I also would render illusory multiple clauses of the Agreement. The Sixth Circuit has expressed special concern about rendering illusory two types of clauses in employee benefits agreements: 1) those guaranteeing spouses benefits until death or remarriage, *Noe*, *supra,* 2008 WL 723769, *8 ; and 2) those guaranteeing employees additional benefits once they reach a certain age or have worked a certain number of years. *Yard-Man*, *supra,* 716 F.2d at 1481 ("If retiree insurance benefits were terminated at the end of the collective bargaining agreement's three-year term, this promise is completely illusory for many early retirees under age [sixty-two].").

Both types of provisions are present in the Agreement. Article 11.15 provides that a Cooper employee's surviving spouse shall be eligible to receive, until death or remarriage, benefits the Agreement describes. It also states that Cooper will provide employees hired after March 9, 1993, who have completed twenty years of employment, benefits the Agreement describes. If Cooper instituted cost-sharing provisions, it would deny those spouses currently living, who have not remarried, benefits the Agreement promises. Likewise, if Cooper instituted caps, it would never have to give employees hired after 1993 benefits the Agreement promises, once they completed twenty years of service for Cooper (at earliest, 2013). Accordingly, this is additional evidence that the parties intended benefits to vest for life without additional caps not in the Agreement.

### v. Reservation of Rights Clause

Finally, as Cooper admits in its brief, the Agreement does not contain a reservation of rights clause. Article 15.4, furthermore, explicitly states that the parties may not amend the Agreement. Therefore, Cooper could not amend the Agreement to limit benefits, further suggesting that the parties intended that benefits vest. *Musto v. American General Corp.*, 861 F.2d 897, 906 (6th Cir.

1988) (finding that the parties did not intend benefits to vest where the Agreement included an explicit clause allowing the employer to amend the Agreement).

Accordingly, I find that the contract is unambiguous as to the parties' intent that medical benefits vest for life without the caps in the Letters.[8]

I make this decision aware of the high standard a plaintiff must meet to prevail at this stage. Three considerations, however, guide my decision.

First, each of the factors the Sixth Circuit has emphasized suggests that the parties intended benefits to vest. Moreover, the Sixth Circuit, *Yard-Man*, *supra,* 716 F.2d at 1480, has rejected the only evidence Cooper provides to the contrary.

Second, my decision accords with the Sixth Circuit's earlier decisions. *See Noe*, *supra,* 2008 WL 723769, *6-13 (finding contract unambiguous as to parties' intent that benefits vest where: the agreement included a general durational clause; a contrary finding would render a clause guaranteeing a spouse benefits until death or marriage nugatory and the parties included specific durational clauses in other articles); *Yolton*, *supra,* 435 F.3d 571, 580-84 (finding that where the agreement included a general durational clause; the Agreement tied eligibility for retirement benefits to pension benefits; and other articles included specific durational clauses not present in the article on retirement benefits, the document's plain language proved that the parties intended that benefits vest); *see also Maurer*, *supra,* 212 F.3d at 918 (finding that although the Agreement was "not a model of clarity," because a contrary conclusion would render illusory a clause guaranteeing

---

[8] Despite the seemingly inconsistent nature of such a finding, the Sixth Circuit has found that a contract, whose granting clause is ambiguous, may be, when examined as a whole, unambiguous as to the parties' intent that benefits vest. *See Loral*, *supra,* 1997 WL 49077, *2-3 (finding that although the text of the contract concerning benefits was "typically confusing," the other provisions of the contract unambiguously showed that the parties intended benefits to vest.)

benefits once an employee reached the age of sixty-five; the durational clauses the defendant cited were  general; and the parties included termination clauses in articles discussing other benefits, but not in the article on retirement benefits, "the language of the CBA indicate[d] that the parties intended for benefits to vest.").[9]

Finally,  additional discovery would only produce extrinsic evidence, which would have no bearing on whether the contract is facially unambiguous.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT plaintiffs Earl Cates, Bobbie Grammar, and Rita Kervin's motion on the pleadings with regards to their claim for breach of the Agreement be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

---

[9]

Cooper argues that these cases are distinguishable as none of them involved contemporaneously negotiated FAS letters. As noted above, unless the Letters either amended or were part of the Agreement, the Letters are only extrinsic evidence and, thus, only relevant if I first determine that the Agreement is ambiguous. In *Pringle*, *supra,* 2007 WL 2236880, *5, furthermore, where the parties stipulated that the letters amended the Agreement, the court concluded that considering that "medical benefits to retirees were still tied to pension benefits, [the Agreement] had no clear durational limit, and [the benefits] were still, in essence, a 'status benefit'," the Agreement was unambiguous as to the parties' intent that benefits vest.

19