IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Earl A. Cates et al.,                                                    Case No. 3:06CV0940

       Plaintiffs,

   v.                                                                      ORDER

 Cooper Tire and Rubber Company,

       Defendant.

This is a dispute over post-retirement health benefits. Plaintiffs Earl Cates, Bobbie Grammar and Rita Kervin allege that Cooper Tire and Rubber Co. [Cooper] – an Ohio-based tire manufacturer and retailer, breached a pension and insurance agreement [Agreement] allegedly requiring Cooper to pay their medical benefits' costs for life and thereby also breached its fiduciary duties. Cates, a former employee of Cooper, and Grammar and Kervin, spouses of former Cooper employees, allege violations of §§ 502(a)(1)(b) and 502(a)(3) of the Employee Retirement Income Security Act of 1984, 29 U.S.C. § 1001, et seq. [ERISA], respectively. Plaintiffs also seek relief on the basis of equitable estoppel. Jurisdiction exists under 28 U.S.C. § 1331 and 29 U.S.C. § 1132.

Pending are Cooper's motions to clarify [Doc. 63] and to reconsider [Doc. 72] and clarify an order entered on May 13, 2008 [Doc. 62] and plaintiffs' motion to strike Cooper's motion to reconsider. [Doc. 74]. For the reasons discussed below, Cooper's motion to reconsider shall be denied and plaintiffs' motion shall be deemed moot. My May 13, 2008 order shall be clarified to the extent necessary.

1

**Background**

Cooper has tire manufacturing plants in Texarkana, Arkansas and Findlay, Ohio, among other places.

Cooper and local labor unions have negotiated a series of Agreements guaranteeing its employees and retirees certain benefits. While the parties negotiated each agreement individually, the Agreements' terms have been similar. Likewise, while the parties have renegotiated the Agreement at each of Cooper's locations multiple times, excluding certain exceptions discussed below, they have not significantly altered the terms.

Among other benefits, the Agreement guarantees all employees certain health benefits. Article 11.1 provides:

> As of the Effective Date and for the duration of the Agreement, the Company will provide the following plan of hospital expense benefits, hospital medical benefits, surgical benefits, prescription drug benefits, dental benefits, vision care and major medical benefits, with the exception that none of the aforementioned benefits (of which all are medically necessary) shall be applicable in the event of accident or ailness covered by the Workers Compensation Act. Charges which are determined by the Company's physician-reviewers, or by provision of Title XVIII of Medicare, or on the basis of other scientific input to not be medically necessary or not accepted as medically appropriate for the treatment of any non-occupational illness or injury will not be covered expenses. These benefits are subject to the provisions of the Memorandum of Agreements concerning health care dated January 7, 1987.[1]

[Doc. 1, Ex. 1].

Article 11.2, entitled "Deductions and Co-Payment Amounts" lists payments beneficiaries must pay:

> (a) the deductible under the basic medical plan will be two hundred dollars ($200) per employee, including dependents, each benefit year; (b) the co-payments for all

---

[1]

As the Agreements are comparable, I will not provide each Agreement's language. For this opinion's purposes, I will use the Texarkana Agreement effective March 17, 1999.

2

eligible charges under the basic medical plan will be twenty percent (20%); (c) the co-payment maximum per benefit year will be eight hundred dollars ($800) exclusive of the charges used to satisfy the deductible in (a) above. Once the eight hundred dollars ($800) limit is reached in a benefit year, the basic medical plan will pay one hundred percent (100%) of those eligible expenses incurred during the remainder of the same benefit year.[2]

[*Id.*]

Section 11.15 extends these benefits to certain retirees, their spouses and their dependants:

Employees who retire and who are eligible under the Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in the Article . . . The surviving spouse of an employee who is retired by the Company on or after the effective date of the Agreement . . . shall continue to be eligible to receive such benefits to the earlier date of death or remarriage provided such spouse, as of the date of death of such retired former employee, was covered for these benefits as an eligible dependent at the time of the Employee's retirement or had been legally married to the Employee for at least twelve (12) consecutive months preceding his death . . . . Employees hired after March 6, 1993 and who retire after completion of at least twenty (20) years of continuous service and who are eligible and receiving a monthly pension shall receive the benefits described in this article.

[*Id.*]

Article 4.1 addresses retirees' pension benefits:

An employee retiring during the life of the Agreement who shall have attained the age of sixty-five (65) and who either has not less than five (5) years of Credited

---

[2]

The Agreements changed in one significant regard. Cooper gradually increased the deductible and co-payments it required. As per its Texarkana employees, in 1989, the Agreement provided that the deductible under the basic medial plan would be $200. The Agreement did not require a co-pay. In 1999, the Agreement required a deductible of $200 plus a co-pay of twenty percent for all eligible charges not exceeding $800 dollars per year. In 2002, Cooper increased the deductible to $300 with a twenty percent co-pay for in-network services and a thirty percent co-pay for out of network services, not exceeding $1500 dollars per year. These changes applied to employees, employees who retired during the term of the relevant Agreement and already-retired employees. Cooper listed these changes in a memorandum it distributed annually to employees. Cooper also increased the deductible and co-payments for Findlay employees and the cost of prescription drug benefits for employees at both plants.

3

Service at his Normal Retirement Date or shall have been hired before his attainment of age sixty (60) shall be entitled to receive a pension upon retirement and upon the filing of an application for benefits as hereinafter provided . . . An employee who shall have attained Normal Retirement Age shall have a non-forfeitable interest in the Pension.

[*Id.*]

Article 9.1 provides "Survivor Income Benefits":

During the life of this Agreement, the Company will provide for active Employees[,] beginning on the day following completion of thirty (30) days of Continuous Service Credit[,] the Survivor Income Benefits described in this article.

[*Id.*]

Article 9.2 limits these benefits' duration:

If an Employee dies on or after the Effective Date, while covered for Transition Survivor Income Benefits, leaving one or more survivors . . . payment of not more than twenty-four (24) monthly Benefits shall begin . . .

[*Id.*]

Article 13.1 discusses "Supplemental Workers' Compensation Benefits":

With respect to an absence, caused by occupational injury or illness, the following plan of Supplemental Workers' Compensation Benefits will continue in effect for the duration of the Agreement for all employees in the Bargaining Unit.

[*Id.*]

Article 13.4 discusses these benefits' duration:

Benefits will be paid for the duration of the disability[,] but not to exceed fifty-two (52) weeks for each period of disability. Periods of disability due to the same cause will be considered the same period of disability.

[*Id.*]

Section 15.4 limits the Agreement's duration:

The Agreement shall continue in effect until and including the 4th day of March, 2000. Thereafter, it shall renew itself for yearly periods unless written notice is given

by either party to the other not less than sixty (60) days, but not more than seventy-five (75) days, prior to the expiration date or an extension thereof, that it desire[s] to terminate or amend this Agreement . . . . If negotiations are not completed prior to the expiration date, this Agreement together with the Basic Labor Agreement, shall terminate unless extended by mutual agreement of the Parties. Upon termination[,] this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination. Except as herein otherwise provided, no provision of this Agreement shall be subject to change prior to the expiration date of this Agreement.

[*Id.*]

Along with copies of the Agreement, Cooper annually distributed to its employees an Employment Benefit Summary [Summary] summarizing the then-valid Agreement's contents. Each copy included a general disclaimer on its first page stating that Cooper guaranteed the described benefits only for the stated period. For example, the 1999 Summary Cooper distributed to its Texarkana employees explicitly stated that benefits described were for the period beginning on March 17, 1999 and concluding on March 4, 2002.

In 1991, Cooper contemporaneously began negotiating a series of supplementary agreements, which the parties refer to as letters [Letters], with local unions regarding "caps" [i.e., limits] on the medical benefits the Agreements required Cooper to provide.

In December, 1990, the Financial Accounting Standards Board issued Financial Accounting Standards Statement No. 106 [FAS 106] requiring companies to recognize the projected future cost of providing post-retirement benefits as an expense when the employees performed services, rather than when the company paid those benefits. To limit such expenses, Cooper wanted to impose caps on the benefits it provided to retirees.

Excluding the 1992 Texarkana letter, Cooper and an individual union representing Cooper's employees agreed to each Letter.

5

The Letters' terms were similar. Each Letter set a cap on the dollar amount Cooper would pay annually towards the medical expenses of employees who retired on or after a certain date or dates. If the annual company contributions, calculated on a per retiree basis, exceeded the cap, then Cooper would allocate the excess cost evenly among all retirees and surviving spouses.[3]

Finally, each Letter included an implementation date after which Cooper would impose the caps.

Cooper did not distribute the Letters to employees, nor did it disclose their contents in the annual Summaries. Cooper, however, alleges that it notified its employees of the caps in a 1995 memorandum that the union should have distributed to its members.

In December, 2003, Cooper sent a letter to all affected hourly retirees and surviving spouses explaining the caps' effect on medical benefits. Cooper sent a follow-up letter on December 19, 2003, announcing the required contributions for retirees and surviving spouses for 2004. In January, 2004, Cooper implemented the caps.

---

[3]

The Letters explained how Cooper would calculate the retirees' contributions:

> 1. The average annual Company contributions to be paid for all health care benefits per retired employee (including their surviving spouses) who retired on or after November 16, 1992, shall not exceed $9,800 for retirees (including surviving spouses) under age sixty-five and $3,850 for retirees (including surviving spouses) over age sixty-five . . .
> 2. If the average annual cost of health care benefits for each such group described in paragraph one above exceeds the amount, the cost in excess of that amount shall be allocated evenly to all retired employees (including surviving spouses) in such group.
> 4. The average annual cost of health care benefits for each such group shall be determined by taking the annual health care payments made by the Company for each group separately and dividing each amount by the number of employees (including surviving spouses) in such group as of January 1 of each year.

[Doc. 23, Ex. 3].

6

Plaintiffs subsequently filed this suit seeking to enjoin Cooper from imposing a cap on or requiring additional costs for retiree medical benefits. The plaintiffs also seek attorneys' fees, costs, and additional unspecified damages.

On May 13, 2008, I granted plaintiffs' motion for judgment on the pleadings finding that the Agreement was unambiguous regarding the parties' intent that employees' retirement benefits vest for life. *Cates v. Cooper Tire & Rubber Co.*, 555 F.Supp.2d 878 (N.D. Ohio 2008).

### Discussion

### 1. Motion to Reconsider

Reconsideration is only appropriate: "1) to accommodate an intervening change in controlling law; 2) to account for new evidence not available at trial; or 3) to correct a clear error of law or to prevent a manifest injustice." *Sherwood v. Royal Ins. Co. of America*, 290 F. Supp. 2d 856, 858 (N.D. Ohio 2003). Where, however, "something material was overlooked or disregarded . . . [which] point[s] to substantial error of fact or law" reconsideration may be warranted. *Miller v. Norfolk S. Rwy. Co.*, 208 F. Supp. 2d 851, 853 (N.D. Ohio 2002) (citations omitted).

A motion to reconsider, under Fed. R. Civ. P. 59(e), is an inappropriate means to advance new arguments or supporting facts that were available when the parties originally briefed the issue. *Van Skinner v. United States*, 751 F. Supp. 1522, 1523 (D. Kan. 1990). Parties cannot raise arguments which they could and should have made before the court issued judgment. *Harley-Davidson Motor Co. v. Bank of New England – Old Colony*, 897 F.2d 611, 616 (1st Cir. 1990).

Cooper presents two arguments in its motion to reconsider. Cooper, first, asserts that I must read the Agreement and the Letters together when ascertaining the parties' intent. Accordingly, it

7

asserts, if I read these documents together, it will be clear that the parties did not intend that the retirement benefits vest for life without caps. Second, Cooper argues that *Int'l Union v. Yard-Man Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983) is inapplicable to this case, and therefore, because I allegedly based my earlier decision on a method of contractual interpretation derived from *Yard-Man*, it was incorrect. I find neither argument well-taken.

### A. Must the Agreement and the Letters Be Read Together?

Cooper in its motion to reconsider argues that I must read the Agreement and the Letters together at step two of the *Yard-Man* analysis. Unfortunately for it, as I explicitly pointed out in my earlier opinion, not only did it fail argue this in its initial briefs, it asserted the opposite.

In its central decision on the interpretation of employee benefits agreements, *Yard-Man*, *supra*, 716 F.2d at 1479-80 (6th Cir. 1983), the Sixth Circuit stated:

> Whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties . . . The parties may, for example, provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement. The enforcement and interpretation of collective bargaining agreements under § 301 [of the LMRA] is governed by substantive federal law. However, traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies . . . [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.  here ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy[,] but

8

rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

Courts can find that rights have vested even if the parties have not explicitly set out the intent to vest in the agreement. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 655 (6th Cir. 1996). In making this determination, a court also may consider the parties' practice, usage and custom. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989).

Cooper devoted the majority of its brief in opposition to plaintiffs' motion for judgment on the pleadings to arguing that the *Yard-Man* framework was inapplicable to this case because none of the previous cases in which courts had applied *Yard-Man* involved contemporaneously negotiated letters similar to those at issue in this case.

In its introduction to its opposition memo, Cooper clearly sets out its position if *Yard-Man* did apply:

> *Even if the relevant provisions of the P and I Agreements and EBP Summaries were ambiguous* as to whether Cooper Tire and the Union intended to vest [p]laintiff's retiree medical benefits for life at no cost, i.e., without caps (which they are not), *Yard-Man* directs this court to look to contemporaneous evidence of an intent to vest. The FASB Letters conclusively demonstrate that Cooper Tire and the Union . . . expressly agreed that [p]laintiffs' medical benefits would be subject to caps.

[Doc. 44] (emphasis added).

Similarly, in section "C", Cooper posited that "even if this [c]ourt analyzes the P and I Agreements and EBP Summaries under *Yard-Man*, these Agreements do not establish an intent to vest [p]laintiffs' retiree medical benefits for life at no cost, i.e., without caps." [*Id.*] Cooper did not argue that the Letters were part of the collective bargaining agreement [CBA] or that I must read the Agreement and the Letters together. Instead, it later asserted that unlike other cases in which "there was no credited extrinsic evidence of a contemporaneous intent not to vest[,] [h]ere such evidence

9

exists in the form of the FASB letters, which memorialize the parties' contemporaneous intent to establish caps." [*Id.*]

Later, Cooper addressed one of the plaintiffs' arguments which relied on the assumption that the parties "engrafted" the Letters into the Agreement. Rather than admitting that the Letters were part of the Agreement, Cooper explicitly stated that "this entire line of argument is essentially irrelevant because the FASB letters were not, in fact, included in the P and I Agreements." [*Id.*]

Cooper, furthermore, explained that the Agreement does not reserve for the parties the authority to "modify, alter, or terminate the health care benefits set forth in the Agreement." [*Id.*]

In its sur-reply brief, in response to a separate argument, Cooper explicitly stated that "the fact that the Letters were separate and distinct agreements whose terms were not bargained over between Cooper and the Union does not render them unenforceable." [Doc. 55]. Likewise, later in footnote eight of the same brief, Cooper explicitly stated "[t]he FASB letters were not included in the P and I Agreements. . . . Unions and companies frequently enter into side agreements that are not incorporated into their collective bargaining agreement." [*Id.*]

In the same footnote, Cooper asserted that *Yard-Man* allows courts to consider the Letters as evidence of the parties' intent regardless of whether the parties manifestly expressed this intent. It explicitly argued: "If it did matter, *Yard-Man* would prohibit courts from looking to extrinsic evidence[;] not permit courts to do so when construing ambiguous contract language. Thus, in this case, all that matters is what the FASB Letters state and what effect Cooper Tire and the Union intended . . . " [*Id.*] On page nineteen of its sur-reply, Cooper explicitly directs the court to "begin its analysis with the P and I Agreement [and] [w]hen faced with ambiguous language . . . . [to] look to other provisions of the document and other extrinsic evidence to determine whether

the parties intended to vest retirement benefits for life." [*Id*.] Cooper, thereafter, continues to describe the Letters' nature and their appropriate place in my analysis: "Thus, this court may consider the FASB Letters as extrinsic evidence. And given the content of the FASB Letters, Cooper Tire respectfully submits that this Court must consider the Letters because they constitute dispositive extrinsic evidence of Cooper Tire and the Union's intent to implement caps." [*Id*.]

In its reply to plaintiffs' notice of supplemental authority, Cooper argued that I, "in that regard," could not push aside the Letters as "extrinsic evidence" because they were "inextricably intertwined" with the Agreement. [Doc. 59]. Cooper at no point suggested that the Agreement and the Letters were part of the same CBA or that I should read the two documents together at step two of the *Yard-Man* analysis. Nor did Cooper explain "in what regard" the Letters were extrinsic evidence and "in what regard" they were not.[4]

Rather, Cooper's main assertion seemed to be that the documents manifested the parties' true intent and, therefore, the spirit of *Yard-Man* required that my analysis ignore the analytical framework *Yard-Man* set out and look beyond the benefits agreement, even if unambiguous. *See* [*id*.] ("Plaintiffs' Notice . . . like its prior submissions to this Court, continues to confuse the relevant inquiry here – namely what Cooper Tire and the Union intended. . . . *Yard-Man* was designed to effectuate the intent of the parties to a collective bargaining agreement, not to frustrate [it]."). Therefore, based on Cooper's assertions and descriptions of the Letters as separate and distinct from the Agreement and as extrinsic evidence I should consider only after I determined that the Agreement was ambiguous, I reserved their consideration. In a footnote, I explicitly cited

---

4

Nor did Cooper make any attempt to explain how these arguments corresponded to its earlier arguments that the Letters were "separate and distinct" and "extrinsic evidence."

instances in which Cooper had admitted both of the aforementioned. After which, I explicitly stated that had Cooper argued the contrary and supplemented this assertion "with sufficient factual allegations, considering the low standard which it has to meet, I might have analyzed the letters as part of the Agreement for this motion's purposes." *Cates*, *supra,* 555 F. Supp. 2d at 886, n. 6.

Cooper in its motion to reconsider makes the argument I said it should have made, namely that I should read the Letters and the Agreement together before I consider any extrinsic evidence. This directly contradicts its earlier arguments – the Letters were extrinsic evidence I should consider because the Agreement is ambiguous.

A motion to reconsider is not an opportunity for counsel to correct his errors. It is not an opportunity to assert those arguments counsel should have made, but failed to make. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (noting that a party should not use a motion to reconsider "to revisit issues already addressed or advance arguments that could have been raised in prior briefing.").

Whether a court must read two agreements together is a question of fact which courts have determined on a case by case basis. *See Aliron Int'l, Inc. v. Cherokee Nation Indus.,* 531 F.3d 863, 868 (D.C. Cir. 2008) ("because the Support Agreement plainly evidences that it was executed to preserve the intent of the Subcontract, the two contracts must be read together as one under Oklahoma law"); *Lands' End, Inc. v. Remy*, 447 F. Supp. 2d 941, 950-51 (W.D. Wis. 2006) (declining to read two contracts together because even though the parties signed the contracts at the same time and they referred to each other neither incorporated the other's terms). Likewise, courts do not automatically read FASB Letters together with the benefits agreement at step two of the *Yard-Man* analysis. For example, in *Pringle v. Continental Tire North America, Inc.*, 541 F.Supp.2d

12

924, 932 (N.D. Ohio 2007), the court concluded that it should read a FASB Letter together with the benefits agreement where the parties conceded that the letter amended the agreement.

Here, Cooper not only failed to assert that I should read the documents together, but also admitted: 1) that the Letters were separate and distinct agreements; 2) were not part of or incorporated into the Agreement or the CBA; and 3) did not amend the Agreement. Certainly, as Cooper argues, a court may read together two agreements even though they are separate. Each of the aforementioned, however, weighs against a finding that the agreements were part of the same transaction. Most importantly, Cooper precluded the need for such an analysis by explicitly stating that I should consider the Letters because the Agreement is ambiguous. Accordingly, I accepted its assertions and reserved consideration of the Letters until I had interpreted the Agreement.

Cooper raises two arguments in response.

First, it asserts that the Sixth Circuit has already concluded that I must read the Letters and the Agreement together. As I noted in my earlier opinion, this assertion misreads the Sixth Circuit's opinion in *United Steel Workers of Am. v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277 (6th Cir. 2007). In *United Steelworkers*, *supra,* 474 F. 3d at 278, the Sixth Circuit found that the dispute was within the scope of the arbitration clause in the Agreement. The court reached its decision after extensively analyzing the arbitration clause's wording, applying the presumption in favor of arbitration, and discussing the policy goals which its decision served. *Id.* at 278-82. The court at no point implied that a court must read the agreements together in every instance. In fact, the court's detailed analysis of the context and the clause's wording suggest the decision's limited nature.

13

Certainly, that the Letters fell within the scope of the Agreement's arbitration clause is evidence that I could read the Agreement and the Letters together. As discussed above, however, Cooper explicitly stated that I should interpret the Letters after I analyzed the Agreement.

Second, Cooper asserts that its characterization of the Letters as extrinsic evidence was merely its short-hand for them. It did not know that I would not consider them if they were extrinsic evidence because prior to *Noe v. PolyOne Corp.*, 520 F.3d 548, 2008 WL 723769 (6th Cir. 2008) courts routinely considered such evidence. Accordingly, despite Cooper's characterization of the Letters, it expected I would read them with the Agreement. Underlying this argument is the assumption that *Noe* radically changed the way courts determine whether retirement benefits have vested.

This argument seems disingenuous. Courts interpreting benefits agreements prior to *Noe* considered extrinsic evidence only after finding that the benefits agreement was ambiguous. *See, e.g., Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 579 (6th Cir. 2006) ("Where the above analysis fails to resolve any ambiguities, courts may look to extrinsic evidence to determine the parties' intent.").

*Noe* did not change the framework for determining whether retirement benefits have vested. *See Noe*, *supra,* 520 F.3d at 563 ("As the foregoing analysis makes clear, there is nothing earth-shattering about our holding in this case; it is merely the straightforward application of this circuit's case law."). Rather, in *Noe*, *supra,* 520 F.3d at 558, the Sixth Circuit concluded that the benefits agreement was unambiguous. Therefore, it did not need to look beyond the benefits agreement's text. Similarly, in *Yolton*, *supra,* 435 F.3d at 583, the Sixth Circuit concluded that the Agreement was unambiguous on its face. It considered extrinsic evidence only as a means to buttress

14

its decision. *See id.* ("While the plain language of the CBAs requires us to conclude that the district court did not abuse its discretion by issuing the injunction, we also note that like the *Golden* case, "defendant's conduct also indicates that plaintiffs' benefits were vested."" (citations omitted)).

Nor am I convinced that Cooper did not know its words' effect. Cooper did not merely state in passing that the Letters were extrinsic evidence or separate and distinct from the Agreement. Rather, it structured its brief around the argument that I had to consider the Letters because the Agreement was ambiguous.

### B. Is *Yard-Man* Applicable Here?

Cooper also argues that *Yard-Man* is inapplicable to this case. Cooper asserts that because in this case active employees negotiated caps on their benefits, this case is distinguishable from past cases applying the *Yard-Man* framework. For this reason, my decision to look only to the Agreement in determining whether the benefits vested without caps, as *Yard-Man* and not principles of contract interpretation allegedly dictates, was incorrect.

As discussed in my original opinion, the court in *Yard-Man* based the inference in favor of vesting on two basic principles. First, retirement benefits by their nature are status benefits. *Yard-Man*, *supra,* 716 F.2d at 1482. As such, they carry with them an inference that they continue as long as retirees maintain the prerequisite status. *Id.* Second, while wages, hours, and other terms of employment are mandatory subjects of bargaining, retirement benefits for former employees already retired are not. *Id.* Accordingly, it is inferred that parties intended the bargained for benefits to last indefinitely, as employees would not have an opportunity after they retired to negotiate over them. *Id.*

15

Cooper argues that plaintiffs should not benefit from *Yard-Man* because as active employees they retained a seat at the negotiating table when negotiating the Letters. *See* [Doc. 72] ("This is because active employees who collectively bargained through their Unions over the terms of the FASB Letters did not do so with the "fear that they may not have another opportunity to negotiate over them."). Because they, furthermore, were active employees when they negotiated the caps, the law required Cooper to negotiate with them on the issue of retirement benefits. *See* [*id.*] ("Cooper was required by law to bargain in good faith over the contents of the FASB Letters in response to any Union proposal to alter them. The FASB Letters were never a permissive subject of bargaining.").

This argument misses the point for two reasons. First, the appropriate question is not what the parties intended when they limited the benefits, but what their intent was when they signed the original benefits agreement. *See Yard-Man*, *supra,* 716 F.2d at 1482 ("[E]xamination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended."). What the parties intended when reaching a later agreement does not change their original intent.

Second, and more importantly, the appropriate question is not whether an employee will have the chance to negotiate benefits again while actively employed, but whether the employee will have the opportunity to negotiate benefits after retirement. The Sixth Circuit has considered cases where employees negotiated the benefits agreement while still active. *See Noe*, *supra,* 520 F.3d at 550 ("While employed with BFG, Plaintiffs were represented in the collective bargaining process primarily by the "Union." . . . [D]uring this period, BFG negotiated a series of agreements with other unions that represented employees working at facilities outside of Kentucky. . . . Plaintiffs

16

maintain that the health benefits provided by [these other agreements] were extended to them via a Memorandum of Agreement ("MOA") entered into by Plaintiffs' union and BFG."). The Sixth Circuit has found the inference applicable. *Id.* at 552.

As noted in my original opinion, furthermore, at least one court has found that even where a contract required an employer to negotiate insurance benefits with retirees, the inference applied because the Agreement still concerned retirement benefits which, by their nature, are status benefits. *See Pringle, supra.*, 541 F.Supp.2d at 930  ("the very fact that the benefits at issue belong to retirees creates an inference (but not a presumption) that such benefits are 'intended . . . to continue as long as the beneficiary remains a retiree.'") (quoting *Yard-Man*, *supra,* 716 F.2d at 1482)).

Cooper attempts to undercut the inference's second basis by arguing that my decision disregards the actual status of the benefits in this case because it ignores the Letters. This argument misses the point. The court in *Yard-Man* concluded that because of their nature as status benefits parties understand retirement benefits to continue as long as the prerequisite status is maintained. Cooper's argument that the benefits' status is not what I determined it to be does not undercut the theoretical foundations of whether the inference should apply. No matter what the level of retirement benefits is, they remain status benefits. Thus, there is an inference that they vested at the level the parties agreed to. Cooper's argument is merely a means to reargue whether or not the benefits vested with or without caps.

As discussed in my original opinion, furthermore, these underlying policy bases justify the *Yard-Man* inference, not the *Yard-man* framework which is based on fundamental basics of contractual interpretation. *Yard-Man*, *supra,* 716 F.2d at 1479 ("[T]raditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies."); *Cole*

17

*v. ArvinMeritor, Inc.*, 515 F. Supp. 2d 791, 798 (E.D. Mich. 2007) ("Contrary to [d]efendants' arguments here, this Court merely followed the analytical framework prescribed in *Yard-Man* and applied basic principles of contract interpretation to construe the explicit language of the CBAs to conclude that the language unambiguously promised "health benefits for each retiree's lifetime and for the lifetime of each retiree's eligible dependents and surviving spouses."" (citations omitted)); *Terrell v. Dura Mech. Components,* 934 F. Supp. 874, 879 (N.D. Ohio 1996) ("[T]he Court uses traditional rules of contract interpretation to determine the expressed intent of the parties."). That in this case I looked only to the Agreement and not the Letters in deciding whether the benefits vested without caps, was not a result of the *Yard-Man* framework, as Cooper argues, but a consequence of Cooper's characterization of the Letters as extrinsic evidence, separate and distinct from the Agreement.

As I based my decision solely on the Agreement's text, I never had to apply the *Yard-Man* inference. Accordingly, whether the bases justifying the inference are applicable to this case is ultimately a moot point.

### 2. Motion to Clarify

A district court has the inherent power to modify interlocutory orders prior to a final judgment's entry. *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). I have not entered a final judgment in this action.

Cooper asks that I clarify my earlier order in two regards. First, Cooper asks that I decide under which plan the plaintiffs' benefits vested. While the durational language in the Agreements generally has not changed, the amount of benefits at each plant has varied from Agreement to Agreement. Accordingly, my decision as to which plan was in effect when plaintiffs' benefits vested

18

will significantly impact the amount of benefits plaintiffs receive. Second, Cooper highlights differences in the Agreement provided to employees at its Clarksdale, Mississippi plant.

Cooper presents four possible options as to when plaintiffs' retirement benefits could have vested: 1) when the employee became eligible for a pension; 2) when the employee retired; 3) when Cooper imposed the FASB caps; or 4) presently under the current agreement in effect.

Neither party originally discussed any ambiguity as to when the benefits vested. Rather, both parties conceded that if the benefits vested, they vested at retirement. See [Doc. 44] ("Cooper Tire and the Unions who negotiated the retiree benefits for all [p]laintiffs also negotiated caps on those benefits before any of the [p]laintiffs had retired. Thus, even if the P and I Agreements could conceivably be construed as creating vested benefits . . . these benefits vested, upon retirement with caps."); [Doc. 41] ("Therefore, the FASB Letters and the caps were and are not part of, and have no effect on, [p]laintiffs' benefits that vested upon their retirement.").

As Cooper correctly notes, courts in the Sixth Circuit have differed as to whether retirement benefits vest when a plaintiff becomes eligible for retirement or when the employee actually retires. *Compare Winnett v. Caterpillar, Inc.*, 496 F. Supp. 2d 904, 922 (M.D. Tenn. 2007) ("Like the plaintiffs in the cases cited above, many of the instant plaintiffs would lose otherwise contractually vested health benefits merely because they chose not to retire at a certain date. If the court accepts Caterpillar's reading of the GIP, Caterpillar's promise to provide free lifetime medical benefits would be rendered illusory.") *with Yolton*, *supra,* 435 F.3d at 581 ("[D]urational language only affects future retirees – that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA.").

19

A reading that benefits vested at retirement or when employees became eligible for retirement would be consistent with the Agreement. Like *Winnett*, *supra,* in which the court found benefits vested before plaintiff's retirement, the Agreement here provides that those who retire and who are eligible to receive a pension will receive the benefits described. *See* 496 F. Supp. 2d at 912 (finding that benefits vested when employee became eligible where agreement stated that benefits "will be provided after his retirement from active service for a retired Employee . . . and is eligible for the immediate commencement of a monthly pension under the Non-Contributory Pension Plan."). In contrast, in *International Union, United Auto., Aerospace, & Agric. Implement Workers v. Loral Corp.*, 873 F. Supp. 57, 63 (N.D. Ohio 1994), the court found that similar language guaranteed benefits on retirement. As the parties, however, have conceded the issue, I shall accept their reasonable interpretation. *See United States Use of White Masonry, Inc. v. F. D. Rich Co.*, 434 F.2d 855, 859 (9th Cir. 1970) ("Where a contract is ambiguous and where it has been interpreted by the parties themselves, then the contract should be enforced in accordance with such interpretation.").[5]

Cooper's second contention for clarification is irrelevant. As Cooper acknowledged in its brief in opposition to plaintiffs' motion on the pleadings, plaintiffs do not represent Cooper's employees at its Clarksdale, Mississippi plant. *See* [Doc. 44] ("Plaintiffs have not sought to represent

---

[5]

Neither option three nor four corresponds with my earlier decision. As I have already concluded, plaintiffs' retirement benefits vested without the caps the Letters imposed.

As to option four, by definition, the effect of vesting is that an employer cannot change the level of benefits after an employee has retired. *Yolton*, *supra,* 435 F.3d at 580 (rejecting employer's argument that "retiree's health benefits [are] subject to change every few years based on new agreements."). Accordingly, a finding that plaintiffs' benefits "vested" under a plan negotiated after plaintiffs retired would be inherently contradictory.

20

the Clarksdale retirees in this action."). While, as Cooper argues, its counterclaim may involve its Clarksdale employees, it nor plaintiffs have moved for judgment on the pleadings regarding this claim or briefed the question. Accordingly, my decision did not concern the rights of such employees. Nor would it be appropriate for me to address this claim here.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED that

1. Defendant's motion to reconsider [Doc. 72] be, and hereby is denied;

2. Plaintiffs' motion to strike Cooper Tire's motion for reconsideration [Doc. 74] be, and hereby is denied as moot.

3. Defendant's motion to clarify [Doc. 63] be, and the same hereby is denied except to the extent that this Court's May 13, 2008 order shall not apply to defendant's Clarksdale employees.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

21
