IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Earl A. Cates et al.,                                     Case No. 3:06CV0940

         Plaintiffs

      v.                                                         ORDER

Cooper Tire and Rubber Company,

         Defendant

This dispute over post-retirement health benefits arises under §§ 502(a)(1)(b) and 502(a)(3) of the Employee Retirement Income Security Act of 1984, 29 U.S.C. § 1001, et seq. [ERISA]. Named plaintiffs Earl Cates, Bobbie Grammar and Rita Kervin alleged that Cooper Tire and Rubber Company [Cooper] – an Ohio-based tire manufacturer and retailer – breached its pension and insurance agreement [Agreement]. I agreed and granted plaintiffs' motion for judgment on the pleadings.[1]

---

[1] On May 13, 2008, I granted plaintiffs' motion for judgment on the pleadings and held that the Agreements unambiguously provided plaintiffs with lifetime, vested medical benefits that could not be reduced. *Cates v. Cooper Tire & Rubber Co.*, 555 F.Supp.2d 878 (N.D. Ohio 2008). On August 18, 2008, I denied defendant's motion to reconsider. *Cates v. Cooper Tire & Rubber Co.*, 2008 WL 3876146 (N.D.Ohio).

Pending is plaintiffs' motion for class certification of the following class:

> All former hourly employees of Cooper's Texarkana, Arkansas plant who retired between November 12, 1992 and April 11, 2005, and all former hourly employees of Cooper's Findlay, Ohio plant who retired between November 24, 1991 and February 15, 2004 with eligibility for retiree health care benefits for themselves, their spouses, and eligible dependants.

[Doc. 65].

For the reasons discussed below, plaintiffs' motion shall be granted and the class, as proposed, shall be certified. Jurisdiction exists under 28 U.S.C. § 1331 and 29 U.S.C. § 1132.

## Background

### Benefit Contracts and Supplemental Letters

Cooper has tire manufacturing plants in Texarkana, Arkansas and Findlay, Ohio, among other places.

In 1983, Cooper negotiated the first in a series of Agreements guaranteeing its employees and retirees certain benefits. Though Cooper and its local labor unions at Texarkana and Findlay negotiated each agreement individually, the Agreements' terms were similar. Likewise, while the parties have renegotiated the Agreement at each of Cooper's locations multiple times, they have not, with certain exceptions discussed below, significantly altered the Agreement's terms.

Among other benefits, the Agreement guarantees all employees certain health benefits. Article 11.1 provides:

> As of the Effective Date and for the duration of the Agreement, the Company will provide the following plan of hospital expense benefits, hospital medical benefits, surgical benefits, prescription drug benefits, dental benefits, vision care and major medical benefits, with the exception that none of the aforementioned benefits (of which all are medically necessary) shall be applicable in the event of accident or ailness covered by the Workers Compensation Act. Charges which are determined by the Company's physician-reviewers, or by provision of Title XVIII of Medicare, or on the basis of other scientific input to not be medically necessary or not accepted

>as medically appropriate for the treatment of any non-occupational illness or injury will not be covered expenses. These benefits are subject to the provisions of the Memorandum of Agreements concerning health care dated January 7, 1987.[2]

[Doc. 1, Ex. 1].

>Article 11.2, entitled "Deductions and Co-Payment Amounts" lists payments beneficiaries must pay:

>(a) the deductible under the basic medical plan will be two hundred dollars ($200) per employee, including dependents, each benefit year; (b) the co-payments for all eligible charges under the basic medical plan will be twenty percent (20%); (c) the co-payment maximum per benefit year will be eight hundred dollars ($800) exclusive of the charges used to satisfy the deductible in (a) above. Once the eight hundred dollars ($800) limit is reached in a benefit year, the basic medical plan will pay one hundred percent (100%) of those eligible expenses incurred during the remainder of the same benefit year.[3]

[*Id.*].

>Section 11.15 extends these benefits to certain retirees, their spouses and their dependants: Employees who retire and who are eligible under the Employee Benefit Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits

---

[2] As the Agreements are comparable, I will not provide each Agreement's language. For the purposes of this opinion, I will use the Texarkana Agreement effective March 17, 1999.

[3] The Agreements changed in one significant regard. Cooper gradually increased the deductible and employees' co-payments. For the Texarkana employees the Agreement in 1989 provided that the deductible under the basic medial plan would be $200. The Agreement did not require a co-pay. In 1999, the Agreement required a deductible of $200 plus a co-pay of twenty percent for all eligible charges not exceeding $800 dollars per year. In 2002, Cooper increased the deductible to $300 with a twenty percent co-pay for in-network services and a thirty percent co-pay for out of network services, not exceeding $1500 dollars per year. These changes applied to active employees, employees who retired during the term of the relevant Agreement and already-retired employees. Cooper listed these changes in a memorandum it distributed annually to employees. Cooper also increased the deductible and co-payments for Findlay employees and the cost of prescription drug benefits for employees at both plants.

>described in the Article . . . The surviving spouse of an employee who is retired by the Company on or after the effective date of the Agreement . . . shall continue to be eligible to receive such benefits to the earlier date of death or remarriage provided such spouse, as of the date of death of such retired former employee, was covered for these benefits as an eligible dependent at the time of the Employee's retirement or had been legally married to the Employee for at least twelve (12) consecutive months preceding his death . . . . Employees hired after March 6, 1993 and who retire after completion of at least twenty (20) years of continuous service and who are eligible and receiving a monthly pension shall receive the benefits described in this article.

[*Id.*].

>Article 4.1 addresses retirees' pension benefits:

>An employee retiring during the life of the Agreement who shall have attained the age of sixty-five (65) and who either has not less than five (5) years of Credited Service at his Normal Retirement Date or shall have been hired before his attainment of age sixty (60) shall be entitled to receive a pension upon retirement and upon the filing of an application for benefits as hereinafter provided . . . An employee who shall have attained Normal Retirement Age shall have a non-forfeitable interest in the Pension.

[*Id.*].

>Article 9.1 provides "Survivor Income Benefits":

>During the life of this Agreement, the Company will provide for active Employees[,] beginning on the day following completion of thirty (30) days of Continuous Service Credit[,] the Survivor Income Benefits described in this article.

[*Id.*].

>Article 9.2 limits these benefits' duration:

>If an Employee dies on or after the Effective Date, while covered for Transition Survivor Income Benefits, leaving one or more survivors . . . payment of not more than twenty-four (24) monthly Benefits shall begin . . .

[*Id.*].

>Article 13.1 discusses "Supplemental Workers' Compensation Benefits":

4

>With respect to an absence, caused by occupational injury or illness, the following plan of Supplemental Workers' Compensation Benefits will continue in effect for the duration of the Agreement for all employees in the Bargaining Unit.

[*Id.*].

Article 13.4 discusses these benefits' duration:

>Benefits will be paid for the duration of the disability[,] but not to exceed fifty-two (52) weeks for each period of disability. Periods of disability due to the same cause will be considered the same period of disability.

[*Id.*].

Section 15.4 limits the Agreement's duration:

>The Agreement shall continue in effect until and including the 4th day of March, 2000. Thereafter, it shall renew itself for yearly periods unless written notice is given by either party to the other not less than sixty (60) days, but not more than seventy-five (75) days, prior to the expiration date or an extension thereof, that it desire[s] to terminate or amend this Agreement . . . . If negotiations are not completed prior to the expiration date, this Agreement together with the Basic Labor Agreement, shall terminate unless extended by mutual agreement of the Parties. Upon termination[,] this Agreement shall terminate in all respects except that the benefits provided by it shall be extended for ninety (90) days following such termination. Except as herein otherwise provided, no provision of this Agreement shall be subject to change prior to the expiration date of this Agreement.

[*Id.*].

Along with copies of the Agreement, Cooper annually distributed to its employees an Employment Benefit Summary [Summary] summarizing the then-applicable Agreement's contents. Each copy included a general disclaimer on its first page stating that Cooper guaranteed the described benefits only for the period stated. For example, the 1999 Summary Cooper distributed to its Texarkana employees explicitly stated that benefits described were for the period beginning on March 17, 1999 and concluding on March 4, 2002.

5

In 1991, Cooper contemporaneously began negotiating a series of supplementary agreements, referred to by the parties as letters [Letters], with local unions regarding caps on the medical benefits the Agreements required Cooper to provide.

In December, 1990, the Financial Accounting Standards Board issued Financial Accounting Standards Statement No. 106 [FAS 106] requiring that companies recognize the projected future cost of providing post-retirement benefits as an expense at the time employees performed services, rather than when the company paid them. To limit its benefits-related expenses, Cooper proposed to the union caps on benefits it provided to its employees.

Excluding the 1992 Texarkana letter, Cooper and an individual union representing Cooper's employees agreed to each Letter.

The Letters' terms were similar. Each Letter set a cap on the dollar amount Cooper would pay annually towards the medical expenses of employees who retired on or after a certain date or dates. If the annual company contributions, calculated on a per retiree basis, exceeded the cap, then Cooper would allocate the excess cost evenly among all retirees and surviving spouses.[4]

---

[4]

The Letters explained how Cooper would calculate the retirees' contributions:

> 1. The average annual Company contributions to be paid for all health care benefits per retired employee (including their surviving spouses) who retired on or after November 16, 1992, shall not exceed $9,800 for retirees (including surviving spouses) under age 65 and $3,850 for retirees (including surviving spouses) over age 65 . . .
> 2. If the average annual cost of health care benefits for each such group described in paragraph 1 above exceeds the amount, the cost in excess of that amount shall be allocated evenly to all retired employees (including surviving spouses) in such group.
> 4. The average annual cost of health care benefits for each such group shall be determined by taking the annual health care payments made by the Company for each group separately and dividing each amount by the number of employees (including surviving spouses) in such group as of January 1 of each year.

Finally, each Letter included an implementation date after which Cooper would impose the caps.

Cooper did not distribute the Letters to its employees, nor did it disclose their contents in the annual Summary. Cooper, however, alleges that it notified its employees of the caps in a 1995 memorandum which, according to Cooper, employee representatives should have distributed.

In December, 2003, Cooper sent a letter to all affected hourly retirees and surviving spouses explaining the caps' effect on medical benefits. Cooper sent a follow-up letter on December 19, 2003, announcing the required contributions for retirees and surviving spouses for 2004. In January, 2004, Cooper implemented the caps.

## Procedural History

The named plaintiffs, spouses of former Cooper employees and a former Cooper employee, are all associated with Cooper's Texarkana plant. They filed this lawsuit on April 18, 2006, and sought to enjoin Cooper from imposing a cap on or requiring additional costs for retiree medical benefits. The plaintiffs also sought attorneys' fees, costs and additional unspecified damages.

On May 13, 2008, I granted plaintiffs' motion for judgment on the pleadings and held that the Agreements unambiguously provided plaintiffs with lifetime, vested medical benefits that could not be reduced. *Cates v. Cooper Tire & Rubber Co.*, 555 F.Supp.2d 878, 889 (N.D. Ohio 2008). On August 18, 2008, I denied defendant's motion to reconsider. *Cates v. Cooper Tire & Rubber Co.*, 2008 WL 3876146, *12 (N.D.Ohio).

---

[Doc. 23, Ex. 3].

**Union Arbitration and the *Steelworkers* Case**

Due to differing interpretations between Cooper and its Findlay local union as to the Letters' cap on medical costs, the Findlay union submitted Grievance Number 2004-1 on January 5, 2004. The grievance disputed Cooper's interpretation and argued that the cap should apply on a "per individual" rather than a "per household" basis. It stated:

> The Union protests the Company's action of implementing the FASB letter under their interpretation of the letter, that being the maximum coverage stated in the agreement is for the retiree and his spouse. The Union's interpretation of the FASB letter is that the maximum coverage stated in the agreement is, "per covered individual," which is consistent throughout the Contract Bargaining Agreement, and has been interpreted in this fashion since its inception in November of 1991. In accordance with the "Pension & Insurance Program," adopted November 6, 2000, Article 14, paragraph 14.1, the Union is requesting a meeting in step 3 of the grievance procedure on this matter.

[Doc. 84].

Although Cooper participated in a step three grievance meeting, it refused to engage in arbitration. The union consequently filed suit challenging Cooper's interpretation of the Letter and failure to enter arbitration. *United Steelworkers of America, AFL-CIO, CLC, et al. v. Cooper Tire* [the *Steelworkers* case], 2005 WL 2649900, *1 (N.D.Ohio). The court certified plaintiffs' class and ordered Cooper to arbitrate the union's grievance. *Id*. at *6-7.

The Sixth Circuit affirmed the order compelling arbitration, but vacated the class certification order. *United Steelworkers of America, AFL-CIO, CLC, et al. v. Cooper Tire*, 474 F.3d 271, 283 (6th Cir. 2007). It found that although the union could arbitrate the grievance on behalf of retirees, surviving spouses and beneficiaries, it first had to obtain their consent because otherwise "retirees and survivors [could] be bound by an unfavorable arbitration decision to which they never consented." *Id*.

Approximately 59% of potential class members ultimately consented to union representation. The consent form stated, in part:

> I understand that the grievance specifically concerns the basis upon which Cooper Tire applies the annual dollar cap on its obligation to provide retiree healthcare, i.e., on a per household basis rather than on a per individual basis. I further understand that by signing this authorization, I give up any right that I may have to file my own lawsuit over this issue.

[Doc. 84].

The parties scheduled an arbitration date, but the union withdrew its grievance with prejudice on September 2, 2008, three weeks after I denied Cooper's motion for reconsideration in *Cates*. Although their Collective Bargaining Agreement [CBA] does not directly address the impact of withdrawing a grievance prior to a scheduled arbitration, Article II, Section A, Note 5 provides, in part:

> Any grievance not appealed within the time limits set forth in Steps 1, 2, 3, and 4 or that are not extended by mutual agreement shall be considered closed and shall not thereafter be reopened. A new grievance on the same subject may be filed at a later date, provided that such grievance cites a change that has occurred subsequent to and that materially affects the situation which existed at the date of closing the previous grievance.

[Doc. 81].

### Class Certification Standard

Rule 23 of the Federal Rules of Civil Procedure sets forth a two-step process to certify a class action. First, Rule 23(a) requires plaintiff to establish that the proposed class meets four prerequisites – namely, numerosity, commonality, typicality and adequacy. Plaintiff must also show that his suit falls within one of Rule 23(b)'s three subcategories.

9

At this stage, I conduct a "rigorous analysis" to ensure that plaintiffs meet all of these requirements, but do not inquire into the merits of plaintiffs' claim. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

## Discussion

### 1. Rule 23(a)

Although Cooper concedes that plaintiffs' proposed class meets Rule 23(a)'s numerosity and commonality requirements, it asserts that the class fails for lack of typicality and adequacy. Cooper proposes subclasses it finds more appropriate for certification.[5]

I disagree with Cooper and conclude that plaintiffs' proposed class satisfies all of Rule 23(a)'s prerequisites. Cooper's suggested subclasses relate to the amount of benefits each class member is entitled; this is a damages issue best left for a later stage in this litigation. *See Randleman v. Fidelity National Title Ins. Co.*, 251 F.R.D. 267, 273 (N.D. Ohio 2008) ("Rule 23 provides courts with necessary flexibility to certify a class and monitor its progress to ensure certification remains appropriate."); *see also Olden v. LaFarge Corp.*, 383 F.3d 495, 509 (6th Cir. 2004) (finding

---

[5]

Cooper proposes five subclasses. All former hourly employees of Cooper's Texarkana plant, with eligibility for retiree health care benefits for themselves, their spouses, and eligible dependents, who retired between: 1) November 12, 1992 and March 5, 1993; 2) March 5, 1993 and January 29, 1996; 3) January 29, 1996 and March 17, 1996; 4) March 17, 1999 and March 4, 2002; and 5) March 4, 2002 and January 1, 2004. [Doc. 81].

If, however, I certify a class including Cooper's Findlay plant, Cooper proposes four additional subclasses. al. All former hourly employees of Cooper's Findlay plant, with eligibility for retiree health care benefits for themselves, their spouses, and eligible dependents, who retired between: 6) November 24, 1991 and October 17, 1994; 7) October 17, 1994 and November 12, 1994; 8) November 12, 1997 and November 6, 2000; and 9) November 6, 2000 and January 1, 2007. [*Id.*].

variations in the precise amount of each class member's damages insufficient to defeat class certification).

### A. Numerosity: Rule 23(a)(1)

The first Rule 23(a) prerequisite, numerosity, requires a class to be sufficiently numerous that joinder of all class members is impractical. Fed.R.Civ.P. 23(a)(1). Plaintiffs need not prove a specific number of putative class members to establish impracticability – instead, courts consider the particular factual circumstances in each case. *Senter v. General Motors Corp.*, 532 F.2d 511, 523 (6th Cir. 1976); *Putnam v. Davies*, 169 F.R.D. 89, 92-93 (S.D. Ohio 1996).

Plaintiffs' proposed class meets the numerosity requirement as the class exceeds 800 retirees, spouses and other eligible dependants, a group so numerous that joinder of individual members is impracticable.

### B. Commonality: Rule 23(a)(2)

A class must share a "common question of law and fact" to meet the commonality prerequisite. *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir. 1997). There must be at least one issue whose resolution will affect all or a significant number class members. *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998).

Here, all class members class share legal questions – namely, whether retiree health benefits provided in the Agreements were vested and whether Cooper violated ERISA by imposing caps and contribution requirements on such benefits. Plaintiffs' proposed class, therefore, sufficiently satisfies Rule 23(a)(2).

**C. Typicality: Rule 23(a)(3)**

To satisfy Rule 23(a)(3), plaintiffs' claim must "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and be "based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996). Typicality often ensues when numerous claims are based on a defendant's "routine and standardized practice." *Randleman, supra,* 251 F.R.D. at 275. If plaintiffs meet these requirements, factual distinctions between named and unnamed class members do not preclude typicality. *Bittinger, supra,* 123 F.3d at 884-85; *Senter, supra,* 532 F.2d at 525 n. 31 (noting that "a representative's claim need not always involve the same facts or law [to satisfy typicality], provided there is a common element of fact or law").

Here, plaintiffs' claims are typical of those of the rest of the class. Both groups' claims arise from the same event – Cooper's unilateral imposition of caps and contribution requirements on retiree health benefits. Named plaintiffs also rely on the same legal theory as their unnamed counterparts – the unambiguous language in Cooper's Agreement intending medical benefits to vest for life without additional caps.

Although plaintiffs' benefit plans differ slightly from those of other class members, such distinctions, mainly about co-pays and deductibles, are minor and do not preclude a finding of typicality. In fact, I have already held the Agreements to be comparable. *Cates I, supra,* 555 F.Supp.2d at 879 ("While the parties have renegotiated the Agreement at each of Cooper's locations multiple times, excluding certain exceptions discussed below, they have not significantly altered the terms.").

Although Cooper concedes that the named plaintiffs' claims are typical of Texarkana retirees, it argues that their claims differ from those of Findlay class members, especially those who consented to union representation. I disagree.

Cooper asserts that plaintiffs' legal claims do not match the claims pursued in the *Steelworkers* case, illustrating the groups' differences. This argument is off base. The fact that the plaintiffs in *Steelworkers* challenged the Letters' interpretation rather than enforcement does not negate the fact that all plaintiffs share a legal question arising from Cooper's course of conduct – a fact sufficient to establish typicality. *See Tomlinson v. Kroger Co.*, 2007 WL 1026349, *4 (S.D. Ohio) ("The requirement of typicality is not onerous. If there is a strong similarity of legal theories, the requirement is met, even if there are factual distinctions among named and absent class members.").

Next, Cooper argues that its interpretation of the Letters binds the Findlay class members who consented to union representation, so that their claims are atypical. I disagree. It is unclear whether the union's withdrawal operates as a finding against its interests. Given the limited scope of the grievance and representation, however, I need not decide this issue.

Even if it were binding, the union's withdrawal cannot prevent Findlay class members from enforcing their ERISA rights. This is so because an arbitrator's decision can only bind individuals on the precise issue in dispute. *See Armco Employees Independent Federation v. AK Steel Corp.*, 252 F.3d 854, 862 (6th Cir. 2001); *Lackawanna Leather Co. v. United Food and Commercial Workers Int'l Union*, 692 F.2d 536, 538 (8th Cir. 1982) ("An arbitrator can bind the parties only on issues that they have agreed to submit  .  .  ."). Findlay retirees never authorized the union to challenge the Letters' enforceability. This is evident from the consent agreement's plain language

which limited the union's representation to one interpretation issue.[6] This authorization, consequently, does not distinguish Findlay class members from named plaintiffs.

Finally, potential affirmative defenses against some class members do not bar class certification, as plaintiffs' claims need not be factually indistinguishable to be typical. *See Bittinger, supra*, 123 F.3d at 884 (rejecting defendants' argument that because plaintiffs' claims are subject to varied defenses due to signed releases, class certification should be denied). For these reasons, I conclude that plaintiffs' claims are typical of all proposed class members, including Findlay retirees who consented to union representation.

### D. Adequacy: Rule (23)(a)(4)

To satisfy Rule 23(a)(4)'s adequacy requirement, named plaintiffs must establish that they share common interests with class members and will vigorously prosecute such interests with qualified counsel. Fed.R.Civ.P. 23(a)(4); *Senter, supra*, 532 F.2d at 525. The first prong merges with Rule 23(b)(3)'s typicality requirement. *In re Am. Med. Sys., supra*, 75 F.3d at 1082. ("A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance

---

[6]

Individuals from Findlay who signed the consent form stated:

> I understand that the grievance specifically concerns the basis upon which Cooper Tire applies the annual dollar cap on its obligation to provide retiree healthcare, i.e., on a per household basis rather than on a per individual basis. I further understand that by signing this authorization, I give up any right that I may have to file my own lawsuit over this issue.

[Doc. 84].

14

the interests of the class members."). For the second prong, courts can look to the attorney's conduct pursuing the litigation thus far. *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 487-88 (W.D. Mich. 1994).

Plaintiffs satisfy Rule 23(a)(4)'s first prong because they share common interests with class members. As discussed above in Sections 1.B and 1.C, plaintiffs and the proposed class suffered the same injury, share the same goal of protecting retiree health care benefits and are free from conflicts of interest.

Cooper argues that plaintiffs are not directly associated with the Findlay plant and therefore cannot adequately represent Findlay class members. I disagree. Because the gravamen of plaintiffs' claim turns on Cooper's conduct towards all retiree benefit plans, Cooper's argument directly contradicts Sixth Circuit precedent. *Fallick, supra,* 162 F.3d 410, 424 (permitting a class representative in one ERISA benefits plan to represent class members in other plans, so long as the gravamen of the dispute turns on the defendant's general practice or conduct towards all affected plans).[7]

Plaintiffs also meet Rule 23(b)(4)'s second prong. Plaintiffs and counsel have provided personal affidavits swearing comprehension of their duties. *See Macula v. Satralloy, Inc.*, 578 F.Supp.563, 571 (S.D. Ohio 1983) (finding counsel to be adequate based on their affidavits). As demonstrated so far during this litigation, counsel is experienced and qualified to handle class action, complex civil litigation and ERISA lawsuits. *See Ballan, supra,* 159 F.R.D. at 487-88.

---

[7] Plaintiffs have provided the name of an individual from Findlay who could serve as a named plaintiff. [Doc. 84]. Based on *Fallick*, this is not necessary.

Based on the foregoing, I grant the appointment of John C. Murdock and Theresa L. Groh and Murdock Goldenberg Schneider & Groh, L.P.A. and Charles A. McCallum III and R. Brent Irby and the law firm of McCallum Hoagland Cook & Irby, L.L.P. as class counsel.

### 2. Rule 23(b)

In addition to Rule 23(a)'s prerequisites, class actions must fall within at least one of Rule 23(b)'s subcategories. Fed.R.Civ.P. 23(b); *In re Am. Med. Sys.*, *supra*, 75 F.3d at 1079. Plaintiffs request class certification under Rules 23(b)(1) and (b)(2), or, in the alternative, Rule 23(b)(3). Although Cooper opposes the certification of one unitary class, it does not challenge plaintiffs' request for certification under Rule 23(b)(1) or (b)(2).[8] For the reasons discussed below, I shall certify plaintiffs' class under Rules 23(b)(1) and (b)(2).

### A. Rule 23(b)(1)

Rule 23(b)(1) authorizes mandatory class actions, meaning that potential class members do not have an automatic right to notice or opt out of the class. *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 645 (6th Cir. 2006). Class actions are appropriately certified under this rule,

> if the prosecution of separate actions by or against individual members of the class would create a risk of (i) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (ii) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed.R.Civ.P. 23(b)(1).

---

[8] "Cooper agrees with Plaintiffs that certification of any class and/or subclass in this case is appropriate under Rule 23(b)(1) and (b)(2)." [Doc. 81].

16

If I deny class certification in this case, individual plaintiffs could file over 800 separate lawsuits, resulting in inconsistent judgments. Such varying decisions could require Cooper to provide vested benefits without modification to some retirees and not others, a result Rule 23(b)(1) is there to avoid. *See Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191, 197 (S.D. Ohio 2002) ("One court could determine that defendant's conduct violated ERISA, while another court could conclude that it did not."); *Fox v. Massey-Ferguson*, 172 F.R.D. 653, 665 (E.D. Mich. 1995) (finding that the prosecution of separate actions could lead to inconsistent adjudications, so that certification under Rule 23(b)(1) was appropriate). I shall, therefore, certify this class under Rule 23(b)(1).

### B. Rule 23(b)(2)

Rule 23(b)(2) also authorizes mandatory class actions. *See Reeb*, *supra*, 435 F.3d at 645. Such class actions are appropriate "if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P 23(b)(2). This rule "does not extend to cases in which the appropriate final relief relates exclusively or *predominately* to money damages." *Reeb*, *supra*, 435 F.3d at 656 (quoting the Advisory Committee Notes 1966, Note on Subdivision (b)(2)).

The class, in its entirety, will benefit from my order requiring Cooper to provide retiree benefits at its cost in the future. Although plaintiffs request past compensation, monetary damages are not their exclusive or predominate requested relief. Past compensation covers only four and a half years of nonpayment, a relatively short period of time compared to the cost of providing retirees with medical benefits for life. Accordingly, I shall certify plaintiffs' class under Rule 23(b)(2).

### C. Rule 23(b)(3)

Class certification under Rule 23(b)(3) is appropriate when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and when class actions are "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Courts certify under this subsection when class actions are not as clearly called for as they are under Rules 23(b)(1) and (b)(2), but where such treatment is still desirable and convenient. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

Because I certified plaintiffs' proposed class under their preferred subsections, there is no need for Rule 23(b)(3) certification. *See Winnett v. Caterpillar, Inc.*, 2007 WL 2044098, *10, 12 (M.D. Tenn. 2007) (declining to certify class under Rule 23(b)(3) after certifying under Rules 23(b)(1) and (b)(2)).

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT plaintiffs' motion for class certification be, and the same hereby is granted.

So ordered.

> s/James G. Carr
> James G. Carr
> Chief Judge